UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, <br><br> Plaintiff, <br><br> v. <br><br> U.S. DEPARTMENT OF JUSTICE, <br><br> Defendant. | Civ. No. 11-0754 (GK) |

## PLAINTIFF'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND COSTS

### INTRODUCTION

Plaintiff Citizens for Responsibility and Ethics in Washington ("CREW") initiated this action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, on April 21, 2011, seeking the disclosure of records maintained by defendant Department of Justice ("DOJ") relating to the agency's investigation of Rep. Don Young (R-AK) concerning allegations of bribery and other illegal conduct. In a memorandum opinion issued on January 10, 2012, the Court denied DOJ's motion for summary judgment and granted CREW's cross-motion for partial summary judgment. *CREW v. DOJ*, 840 F. Supp. 2d 226 (D.D.C. 2012). In so doing, the Court rejected the agency's contention it was not even obligated to search for responsive records or make a particularized showing as to its exemption claims, and directed DOJ to file *Vaughn* indices describing any withheld, responsive records. *Id.* at 236.

As a result of the Court's ruling in CREW's favor, DOJ identified and released a substantial amount of information concerning its investigation of Rep. Young. That information was widely reported by both national and local Alaska news organizations. The clear nexus

between CREW's litigation of this matter and DOJ's disclosure of documents demonstrates CREW's eligibility for an award of attorneys' fees and costs. As we demonstrate below, CREW is both eligible for fees and entitled to fees under the four-factor balancing test this Circuit applies.

## FACTUAL BACKGROUND

### A. CREW's FOIA Requests and DOJ's Denials

News media reports in 2007 raised serious ethics questions concerning the role played by Rep. Don Young in what became known as the "Coconut Road earmark." In response to the controversy, Congress in 2008 took the unprecedented step of directing DOJ to conduct an investigation into the Coconut Road allegations. The Coconut Road earmark investigation provision was enacted as section 502 of the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users (SAFETEA-LU) Technical Corrections Act of 2008, P.L. 110-244 (June 6, 2008), and reads as follows:

> SEC. 502. DEPARTMENT OF JUSTICE REVIEW
>
> Consistent with applicable standards and procedures, the Department of Justice shall review allegations of impropriety regarding item 462 in section 1934(c) of Public Law 109-59 to ascertain if a violation of Federal criminal law has occurred.

On August 4, 2010, the congressional office of Rep. Young issued the following press release:

> A Statement From the Office of Congressman Young
>
> Congressman Young's legal team has been notified that after full cooperation from the Congressman, the Public Integrity Section of the Department of Justice has concluded their investigation and declined prosecution of Congressman Young.

2

*CREW v. DOJ*, 840 F. Supp. 2d at 232 (citation omitted).[1]

By letters dated January 24, 2011, to defendant DOJ's components the Criminal Division, Federal Bureau of Investigation ("FBI"), and Executive Office of U.S. Attorneys ("EOUSA"), CREW requested under the FOIA the following agency records:

> [A]ll records related to investigations conducted by DOJ and the Federal Bureau of Investigation ("FBI") of Rep. Don Young (R-AK) that are not covered by grand jury secrecy . . ., including but not limited to DOJ's decision not to bring criminal charges against him.

*Id.* at 228 (citations omitted). "Without conducting a search for the requested documents, all three entities categorically denied [CREW's] requests pursuant to FOIA Exemptions 6 and 7(C)." *Id*. (citations omitted).

### B.  Proceedings in This Court

CREW initiated this action on April 21, 2011, to challenge DOJ's decision to "categorically" withhold on privacy grounds all potentially responsive information concerning the agency's investigation of Rep. Young. DOJ moved for summary judgment on August 8, 2011 (Dkt. No. 10), arguing that all potentially responsive information was categorically exempt from disclosure on privacy grounds, and that the agency thus was not even obligated to conduct a search or justify the withholding of particular records. CREW opposed DOJ's motion and cross-moved for summary judgment on September 6, 2011 (Dkts. Nos. 11&12).

On January 10, 2012, following full briefing by the parties, the Court denied DOJ's motion for summary judgment and granted CREW's cross-motion for partial summary judgment. 840 F. Supp. 2d 226. The Court found Rep. Young maintained only a diminished privacy interest in withholding the documents sought by CREW. Accordingly, the Court held that the balancing

---

[1] The Court previously recounted the circumstances surrounding the Coconut Road allegations and the congressional directive that DOJ investigate the matter.  *See id*. at 231-232.

3

of Rep. Young's privacy interest against releasing the requested documents weighed in favor of the public interest. *See id*. at 234-36. The Court ordered the Criminal Division, FBI, and EOUSA to submit *Vaughn* indices of the withheld documents. *Id*. at 236.[2]

### C.   The Criminal Division's Response to CREW's Request

Following the Court's January 10, 2012 Memorandum Opinion, the Criminal Division conducted a records search and located records that were responsive to CREW's request. *See* Declaration of John E. Cunningham III ("Cunningham Decl.") ¶¶ 6-13 (Dkt. No. 31-2). On April 9, 2012, DOJ filed a *Vaughn* Index describing the responsive documents withheld or redacted by the Criminal Division. *See* Criminal Division *Vaughn* Index (Dkt. No. 26). By letter dated May 2, 2012, the Criminal Division released to CREW certain documents responsive to its FOIA request. Cunningham Decl. ¶ 55. The Criminal Division released 31 pages with no redactions, 31 pages that were redacted in part, and withheld 292 pages in full under FOIA Exemptions 5, 6, and 7(C). *See id*.

### D.   The FBI's Response to CREW's Request

Following the Court's decision, the FBI conducted a records search and located records that were responsive to CREW's request. *See* Second Decl. of David M. Hardy ("Second Hardy Decl.") ¶ 12 (Dkt. No. 31-4). On April 9, 2012, DOJ filed a *Vaughn* Index describing the responsive documents withheld or redacted by FBI. *See* FBI *Vaughn* Index (Dkt. No. 26-2). By letter dated April 19, 2012, the FBI released to CREW records responsive to its request. Second Hardy Decl. ¶ 11. The FBI released 61 pages with no redactions, 271 pages that were redacted in part, and withheld 3 pages in full (as well as 83 pages withheld as duplicates). *Id*.

---

[2] In response to DOJ's motion for clarification (Dkt. No. 21), the Court issued a minute order on March 12, 2012 explaining the *Vaughn* indices were limited to "those records related to U.S. Department of Justice investigations of U.S. Representative Don Young involving allegations of bribery and other illegal conduct in the matter known as 'Coconut Road.'"

### E. EOUSA's Response to CREW's Request

Following the Court's decision, EOUSA conducted a records search and located records that were responsive to CREW's request. *See* [Second] Declaration of Vinay J. Jolly ("2d Jolly Decl.") ¶¶ 12-14 (Dkt. No. 37-2). On April 9, 2012, DOJ filed a *Vaughn* index describing the responsive documents withheld or redacted by EOUSA. *See* EOUSA *Vaughn* Index (Dkt. No. 26-1). On or about April 23, 2012, EOUSA released to CREW 123 pages of public-source material with no redactions, one page of material that was redacted in part, and withheld 48 pages in full under FOIA Exemptions 3, 5, 6, and 7(C). *See* 2d Jolly Decl. ¶ 12.

### F. The Widespread Dissemination of the Released Information

The public interest in the information released by DOJ as a result of the Court's order was substantial, as evidenced by widely-disseminated news media reports concerning the material. Immediately following DOJ's release of the *Vaughn* indices describing the responsive records, the *Anchorage Daily News* reported that "[t]he Justice Department revealed descriptions of hundreds of documents Monday night that it had prepared in its investigation of Rep. Don Young and the infamous Coconut Road interchange, including what it said was a 'potential witness list and indictment.'" Richard Mauer, *Document list outlines FBI's Florida investigation of Young; Document lists provide insights into interchange investigation*, Anchorage Daily News, April 10, 2012 (filed herewith as Exhibit A). Upon the FBI's disclosure of hundreds of pages of responsive records to CREW, the *New York Times* led its coverage as follows:

> Representative Don Young and his family routinely used campaign funds for personal expenses, like hunting trips, meals and charter flights to his home in Alaska, a former campaign aide to Mr. Young told federal criminal investigators.
>
> The allegations came to light Friday when the Federal Bureau of Investigation released hundreds of pages of documents from a now-closed investigation into Mr. Young's role in 2005 in helping steer $10 million to a road project in Florida favored by a campaign supporter.

5

Eric Lipton, *Alaska Lawmaker Put Campaign Money to Personal Use, Ex-Aide Told Inquiry*, New York Times, April 20, 2012 (filed herewith as Exhibit B). Similar reports were published by the *Alaska Dispatch* (filed herewith as Exhibit C) and *New York Magazine* (filed herewith as Exhibit D). An *Associated Press* article, Nigel Duara, *FBI Source: Alaska Rep. spent campaign cash freely*, Associated Press, April 21, 2012 (filed herewith as Exhibit E), was carried by numerous publications, including the *Juneau Empire* (filed herewith as Exhibit F), *Salon* (filed herewith as Exhibit G) and the *Huffington Post* (filed herewith as Exhibit H).

      CREW produced and published an extensive report detailing the contents of the disclosed records and what they reveal about the Justice's Department's handling of official corruption investigations,[3] and posted on the Web for public access every page of material disclosed by DOJ as a result of this litigation.[4]

## ARGUMENT

### I. AS A SUBSTANTIALLY PREVAILING PARTY, CREW IS ELIGIBLE FOR AN AWARD OF FEES AND COSTS.

      The FOIA authorizes a court to "assess against the United States reasonable attorney's fees and other litigation costs reasonably incurred in any case under [the Act] in which the complainant has substantially prevailed." 5 U.S.C. § 442(a)(4)(E)(i). With this attorney fee provision Congress intended

> to remove the incentive for administrative resistance to disclosure requests based not on the merits of exemption claims, but on the knowledge that many FOIA plaintiffs do not have the financial resources or economic incentives to pursue their requests through expensive litigation.

---

[3] *Available at* http://www.citizensforethics.org/pages/don-young-investigation.

[4] *Available at* http://www.scribd.com/collections/2980138/CREW-Regarding-Rep-Don-Young-Investigations.

*Davy v. CIA*, 550 F.3d 1155, 1158 (D.C. Cir. 2008) (quotation marks omitted), quoting *Nationwide Bldg. Maint., Inc. v. Sampson*, 559 F.2d 704, 711 (D.C. Cir. 1977) (citing S. Rep. No. 98-854, at 17).

Congress amended the attorney fee provisions of the FOIA through the OPEN Government Act of 2007, Pub. L. No. 110-175, § 4(a), 121 Stat. 2524, 2525, to provide in relevant part: "a complainant has substantially prevailed if the complainant has obtained relief through . . . *a judicial order*, or an enforceable written agreement or consent decree . . ." *Id*. at § 4(a)(2), codified at 5 U.S.C. § 552(a)(4)(E)(ii) (emphasis added).

Unquestionably, CREW here has substantially prevailed within the meaning of the OPEN Government Act of 2007, making it eligible for a fee award. Through this litigation – and as a direct result of the Court's decision of January 10, 2012 – CREW obtained hundreds of pages of documents the agency refused to disclose until CREW filed suit. As the background to this matter makes clear, the filing of this lawsuit and the Court's intervention were necessary to compel a change in DOJ's behavior that inured to CREW's benefit, specifically the production of requested documents, making CREW a "substantially prevailing" party. *See Davis v. U.S. Dep't of Justice*, 610 F.3d 750, 752 (D.C. Cir. 2010) ("FOIA plaintiffs [are] eligible for a fee award if the lawsuit substantially caused the agency to release the requested records."); *Burka v. U.S. Dep't of Health & Human Servs.*, 142 F.3d 1286, 1288 (D.C. Cir. 1998) (holding that party claiming attorney's fees "must first establish eligibility by showing that the lawsuit was reasonably necessary and the litigation substantially caused the requested records to be released"); *see also Edmonds v. FBI*, 417 F.3d 1319, 1326-27 (D.C. Cir. 2005) ("substantially prevail" requirement satisfied where plaintiff has "succeed[ed] on any significant issue in litigation, achieving some of the benefits the parties sought in bringing the suit.").

7

It is beyond dispute that CREW "obtained relief through . . . a judicial order," 5 U.S.C. § 552(a)(4)(E)(ii).  As the Court noted in its memorandum opinion, "[t]his case presents one issue: whether the Department of Justice and its component entities acted lawfully in 'categorically' denying Plaintiff's FOIA requests."  840 F. Supp. 2d at 230.  The Court emphatically answered that question in CREW's favor, resulting in the public disclosure of hundreds of pages of material that DOJ had previously refused even to describe in *Vaughn* indices.  CREW is clearly eligible for an award of attorneys' fees and costs reasonably incurred in achieving that result.

## II. CREW IS ENTITLED TO AN AWARD OF FEES AND COSTS.

Once eligible, a FOIA plaintiff must demonstrate its entitlement to a fee award. The D.C. Circuit has directed courts to employ a four-factor balancing test to determine a FOIA plaintiff's entitlement that considers: (1) the public benefit derived from the case; (2) the commercial benefit to the plaintiff; (3) the nature of the plaintiff's interest in the records; and (4) the reasonableness of the agency's withholding of the requested documents.  *Tax Analysts v. U.S. Dep't of Justice*, 965 F.2d 1092, 1093-94 (D.C. Cir. 1992); *see also Negley v. FBI*, 818 F. Supp. 2d 69, 73 (D.D.C. 2011).  As the D.C. Circuit has explained, "[e]ssentially, the first three factors assist a court in distinguishing between requesters who seek documents for public informational purposes and those who seek documents for private advantage." *Davy*, 550 F.3d at 1160.  Here, consideration of the relevant factors clearly supports awarding CREW its attorney fees and costs.

### A. The Public Derived a Significant Benefit From the Disclosure of the Requested Records.

In determining whether the "public benefit" factor weighs in favor of granting a fee award, the court looks to whether "the complainant's victory is likely to add to the fund of information that citizens may use in making vital political choices." *Cotton v. Heyman*, 63 F.3d

8

1115, 1120 (D.C. Cir. 1995), citing *Fenster v. Brown*, 617 F.2d 740, 744 (D.C. Cir. 1979). The result here clearly meets that test.

Through this lawsuit CREW obtained never-before released documents on a matter of great public interest that shed light on DOJ's handling of a high-profile investigation of alleged official misconduct involving an influential member of Congress. As the Court has already found in rejecting DOJ's initial position in this case,

> [i]t is difficult to understand how there could not be a substantial public interest in disclosure of documents regarding the manner in which DoJ handled high profile allegations of public corruption about an elected official. Clearly, the American public has a right to know about the manner in which its representatives are conducting themselves and whether the government agency responsible for investigating and, if warranted, prosecuting those representatives for alleged illegal conduct is doing its job.

840 F. Supp. 2d at 234. The Court continued:

> In addition to the widespread public interest in this country at this time in holding its Government accountable, we have the added, and decidedly uncommon fact in this case, that Congress passed a specific piece of legislation . . . directing DoJ to conduct an investigation of all "allegations of impropriety regarding [the Coconut Road earmark] to ascertain if a violation of Federal criminal law has occurred." . . .
>
> Given the fact that Rep. Young was at that time Chair of the House of Representatives Transportation Committee, and given the detailed remarks he made on the floor of the House of Representatives about this matter, there is a substantial public interest in examining the adequacy of DoJ's enforcement of other types of law governing the activities of federal officials, in addition to the explicit direction given by Congress to DoJ to investigate the Coconut Road matter.

*Id*. at 234-235 (citations and footnotes omitted).

Indeed, the accuracy of the Court's assessment of the public interest present here was borne out several months after it ruled, when articles detailing the contents of the documents obtained by CREW were published by a wide range of media outlets, including the *New York Times*, *Associated Press* and news organizations in Rep. Young's home state of Alaska. Exhibits

9

A-H.  Such demonstrated public interest strongly weighs in favor of an award of attorneys' fees and costs.  *See*, *e.g.*, *Judicial Watch, Inc. v. U.S. Dep't of Justice*, 878 F. Supp. 2d 225, 235 (D.D.C. 2012) (fees awarded where documents illuminating "prosecutorial decisionmaking" were disclosed, noting "the national media coverage garnered by this issue");  CREW v. *Dep't of Justice*, 820 F. Supp. 2d 39, 45-46 (D.D.C. 2011) (finding that public benefit factor weighed in favor of awarding fees where the "FOIA requests at issue . . . concern[ed] information related to a controversy of significant public import," and noting that "various media outlets covered the story").

> B.  **CREW Derived No Commercial Benefit From the Disclosures it Obtained From this Lawsuit, and Instead Shares the Public Interest in the Contents of the Disclosed Documents.**

The "commercial benefit" and "plaintiff's interest" factors are closely related and typically considered together.  *Tax Analysts*, 965 F.2d at 1095.  Here, CREW is a nonprofit corporation organized under section 501(c)(3) of the Internal Revenue Code.  Complaint, ¶ 3.  CREW is committed to protecting the right of citizens to be informed about the activities of government officials and to ensuring the integrity of government officials.  *Id*.  To advance its mission, CREW uses research based in part on government records made available to it under the FOIA.  *Id*.  CREW disseminates publically all documents it acquires from its FOIA requests, including those at issue here, through its own website as well as another website on which CREW posts documents for public review at no charge.  *See*, *e.g.*, nn. 3&4, *supra*.  CREW filed the FOIA request at issue in this public interest capacity.

Further, CREW has no commercial interest in the requested documents.  As CREW explained in justifying its request for a fee waiver, CREW sought the documents at issue expressly for public dissemination on an issue of public importance.  Exhibit A (attached to

Declaration of David M. Hardy (Dkt. No. 10-4)) at 3. CREW has now disseminated the documents it acquired from these FOIA requests on its website and on www.scribd.com at no charge, and published on its website a free report based on information it gleaned from the released documents, "What CREW Has Learned About Don Young," *available at* http://www.citizensforethics.org/ pages/don-young-investigation. As an entity that "gathers information of potential interest to a segment of the public, uses [its] editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience," CREW is "among those whom Congress intended to be favorably treated under FOIA's fee provisions." *Davy*, 550 F.2d at 1161-62, quoting *Tax Analysts*, 965 F.2d at 1095-96. *See also CREW v. U.S. Dep't of Justice*, 820 F. Supp. 2d at 45.

Awarding CREW its attorney fees here would further the underlying purpose of the FOIA's fee provision: "encourag[ing] Freedom of Information Act suits that benefit the public interest." *LaSalle Extension Univ. v. Fed. Trade Comm'n*, 627 F.2d 481, 484 (D.C. Cir. 1980). *See also Davy*, 550 F.3d at 1160-61 ("a court would generally award fees if the complainant's interest in the information sought was scholarly or journalistic or public-interest oriented, [unless] . . . his interest was of a frivolous or purely commercial nature.") (quotation marks omitted), quoting *Fenster v. Brown*, 617 F.2d 740, 742 n.4 (D.C. Cir. 1979); *CREW v. U.S. Dep't of Justice*, 820 F. Supp. 2d at 46. Under these circumstances, CREW, as an entirely non-commercial entity serving the public interest exclusively, satisfies the second and third factors for a fee award.

      **C.**    **DOJ's "Categorical" Denial of CREW's FOIA Requests Lacked a Reasonable Basis in Law.**

The fourth entitlement factor "considers whether the agency's opposition to disclosure 'had a reasonable basis in law,' and whether the agency 'had not been recalcitrant in its

opposition to a valid claim or otherwise engaged in obdurate behavior.'" *Davy*, 550 F.3d. at 1162 (citations omitted). "The question is not whether [the plaintiff] has affirmatively shown that the agency was unreasonable, but rather whether the agency has shown that it had any colorable or reasonable basis for not disclosing the material until after [the plaintiff] filed suit." *Id*. at 1163. When measured against this standard, DOJ's initial position here was unreasonable.

As the Court noted in the decision that gives rise to CREW's fee request, "[t]his case presents one issue: whether the Department of Justice and its component entities acted lawfully in 'categorically' denying Plaintiff's FOIA requests." 840 F. Supp. 2d at 230. Through its "categorical" denial, DOJ sought to depart from "the usual practice" whereby agencies "submit an affidavit (referred to as the '*Vaughn* Index') specifically identifying each document they seek to withhold and/or the precise redaction of each document they wish to make, along with 'a relatively detailed justification' for their assertions." *Id*. at 229-230.

DOJ premised its attempt to depart from "the usual practice" upon the remarkable assertion that its mere acknowledgement that responsive records existed would constitute an "unwarranted invasion" of Rep. Young's privacy. The agency "argue[d] that it was permitted to categorically refuse [CREW's] requests because Rep. Young has a privacy interest in the requested records and [CREW] has failed to articulate a public interest that overrides his privacy interest." *Id*. at 230.

With respect to Rep. Young's asserted privacy interest, the Court first discussed the generally applicable considerations courts consider when conducting the balancing of interests under Exemptions 6 and 7(C). The Court then noted, however, that

> general principles of privacy have far less force in this case because the information — namely, the fact that DoJ conducted an investigation of activities involving Rep. Young — is already a matter of public record. Rep. Young has himself confirmed in a press release issued by his Congressional office that there

12

> was an investigation into his activities, and has recognized that he has "been the subject of much innuendo concerning [his] intent and motivation of this project [referring to the Coconut Road Earmark]."  One can have no privacy interest in information that is already in the public domain, especially when the person asserting his privacy is himself responsible for placing that information into the public domain.

*Id*. at 233.  In support of its privacy argument, DOJ sought to rely primarily upon *Kimberlin v. U.S. Dep't of Justice*, 139 F.3d 944 (D.C. Cir. 1998).  But the Court found that case readily distinguishable: "While the Government cites *Kimberlin* in support of its position, neither the procedural posture nor the substantive holding of *Kimberlin* support its position. . . . *Kimberlin* did not involve a categorical denial of documents."  840 F. Supp. 2d at 233.

Turning to DOJ's assertion that CREW had "failed to articulate a public interest," the Court had little trouble disposing of the argument: "It is difficult to understand how there could not be a substantial public interest in disclosure of documents regarding the manner in which DoJ handled high profile allegations of public corruption about an elected official."  *Id*. at 234.  Indeed, when the Court turned to the balancing of the asserted interests, it made clear that this was not a close case:

> The Court concludes that the balancing of Rep. Young's privacy interest against the public interest in releasing the requested documents tips strongly in favor of the public interest.  As already explained, Rep. Young's private interest is minimal, albeit not *de minimis*, given that DoJ's investigation of him is not a secret and that he himself publicly announced the results of that investigation and discussed his involvement in the proceedings.  Above all, because release of this information would "contribute significantly to public understanding of the operations or activities of the government," the public interest in releasing this information is very strong.  The public needs to know how DoJ carried out its statutory duties to investigate allegations of bribery and corruption of members of Congress.  That is the purpose of FOIA.

*Id*. at 236 (citation omitted).

Ultimately, DOJ's lack of a "reasonable basis" for its "categorical" denial of CREW's FOIA request on privacy grounds was demonstrated when, after being compelled by the Court to

13

submit a *Vaughn* index and justify the withholding of individual documents, the agency released hundreds of pages of responsive material, with only *two* pages withheld in full solely on the basis of FOIA's privacy exemptions.  Dkt. Nos. 26, 26-1 & 26-2 (*Vaughn* indices).  These circumstances support the conclusion the agency had no reasonable, legitimate basis for "categorically" withholding the documents it ultimately released as a result of the Court's January 10, 2012 ruling.

### III.   THE REQUESTED FEE AWARD IS REASONABLE.

After determining a plaintiff's eligibility and entitlement to attorney's fees, the court must determine "the proper amount of the fee award," *Summers v. Dep't of Justice*, 477 F. Supp.2d 56, 63 (D.D.C. 2007).  Fee awards are calculated employing the "usual method of . . . multiply[ing] the hours reasonably expended in the litigation by a reasonable hourly fee, producing the lodestar amount." *Judicial Watch, Inc. v. Bureau of Land Mgmt.*, 562 F. Supp.2d 159, 175 (D.D.C. 2008) (internal quotation and citation omitted).

#### A.   The Court Should Apply the Updated *Laffey* Matrix to Determine the Prevailing Market Rates for Legal Services.

Plaintiff's attorneys, as public interest lawyers, do not have customary hourly billing rates. Declaration of David L. Sobel ("Sobel Decl.") and Declaration of Anne L. Weismann ("Weismann Decl.") (filed herewith as Exhibits I & J).  In *Blum v. Stenson*, 465 U.S. 886, 896 (1984), the Supreme Court held that public interest attorneys may be awarded fees according to the prevailing market rates in the community.  *See also Act Now to Stop War & End Racism Coalition v. District of Columbia*, 286 F.R.D. 145, 149 (D.D.C. 2012) ( "The appropriate hourly rate for public interest legal service organizations and for-profit firms engaged in public interest work is the prevailing market rate."), quoting *Judicial Watch, Inc. v. Dep't of Commerce*, 384 F. Supp. 2d 163, 170 (D.D.C. 2005).

14

To ascertain appropriate rates in this jurisdiction, "use of the broad *Laffey* matrix may be by default the most accurate evidence of a reasonable hourly rate." *Northwest Coalition for Alternatives to Pesticides v. EPA*, 421 F. Supp. 2d 123, 129 (D.D.C. 2006).[5] "Attorneys who do not charge a billing rate, such as those employed with non-profit or public interest groups, may be compensated at the hourly" market rate reflected in the *Laffey* Matrix. *Bolden v. J & R Inc.*, 135 F. Supp. 2d 177, 179 (D.D.C. 2001); *see also Judicial Watch v. U.S. Dep't of Justice*, 774 F. Supp. 2d 225, 232 (D.D.C. 2011) ("For public-interest . . . lawyers who do not have customary billing rates, courts in this circuit have frequently employed the '*Laffey* Matrix.'").

Since at least 2000, this Court has approved the use of a version of the *Laffey* matrix updated through the application of the legal services component of the Consumer Price Index ("CPI") to bring rates from earlier years in line with current economic realities. *See Salazar v. District of Columbia ("Salazar I")*, 123 F. Supp.2d 8, 11-15 (D.D.C. 2000). While the U.S. Attorney's Office for the District of Columbia maintains its own version of the fee matrix, this Court reiterated in 2011 that it "still believes that use of the National Legal Services CPI 'has the distinct advantage of capturing the more relevant data because it is based on the legal services component of the Consumer Price Index rather than the general CPI on which the U.S. Attorney's Office matrix is based.'" *Salazar v. District of Columbia ("Salazar II")*, 750 F. Supp. 2d 70, 73 (D.D.C. 2011), quoting *Salazar I*, 123 F. Supp.2d at 14-15. *See also Smith v. District of Columbia*, 466 F. Supp. 2d 151, 156 (D.D.C. 2006) ("The Court concludes that the use of the updated *Laffey* Matrix is reasonable and consistent with previous precedent from our Court of Appeals, as well as from this Court in *Salazar [I]*."); *Interfaith Cmty. Org. v. Honeywell Int'l,*

---

[5] "The *Laffey* matrix is 'a schedule of charges based on [particular attorneys'] years of experience' developed in *Laffey v. Northwest Airlines, Inc.*, 572 F.Supp. 354 (D.D.C. 1983)." *Judicial Watch, Inc. v. Bureau of Land Mgmt.*, 562 F. Supp. 2d at 175.

*Inc.*, 726 F.3d 403, 414-416 (3d Cir. 2013) (affirming district court's "use of the LSI-updated *Laffey* Matrix to determine the prevailing rates in the Washington, D.C. market.").

Most recently, in *Eley v. District of Columbia*, 2013 U.S. Dist. LEXIS 164995 (D.D.C. Nov. 20, 2013), the Court conducted a lengthy and detailed analysis of the appropriate methodology with which to determine "prevailing market rates" for attorney fee awards. After surveying relevant data from a variety of sources, and considering some judicial critiques of the Legal Services Index ("LSI") component of the CPI as a means of determining market rates, the Court concluded that "the LSI-adjusted matrix is probably a *conservative* estimate of the actual cost of legal services in this area, but at the very least it appears to be a more accurate reflection of the cost of legal services both in this community and nationwide" than the matrix maintained by the U.S. Attorney's office. *Id*. at 37-38 (emphasis in original). The Court thus held that "the LSI-adjusted rates are an appropriate measure of the prevailing community rates for attorneys in the Washington, D.C. area." *Id*. at 44.

CREW here relies upon a recently updated *Laffey* matrix calculated by Dr. Michael Kavanaugh, the expert economist whose analytical method the Court adopted in *Salazar I & II* and *Eley*. *See,* e.g., *Salazar II*, 750 F. Supp. 2d at 73 ("Dr. Kavanaugh's explanation makes good sense …"); *Eley*, 2013 U.S. Dist. LEXIS 164995, at 23 (court relied upon updated *Laffey* matrix "'developed by an expert economist,'" Michael Kavanaugh, Ph.D."). As Dr. Kavanaugh explains in his declaration, his current calculations of prevailing market rates for legal services in the Washington, DC area are based upon the same methodology he employed, and the Court adopted, in *Salazar I*. Declaration of Michael Kavanaugh ("Kavanaugh Decl.") (filed herewith as Exhibit K) ¶ 12. Based upon that methodology, Dr. Kavanaugh has calculated that the prevailing market rates for work performed by attorneys with more than 20 years of experience

16

(like Mr. Sobel and Ms. Weismann)[6] were $709/hour between June 2010 and May 2011, and $734/hour between June 2011 and May 2012. *Id*., ¶ 24. Notably, these rates are consistent with the findings of a survey conducted by the *National Law Journal* in 2012, which reported on rates for partners in four large Washington, DC law firms, with "high" reported rates ranging from $1,250 to $985 per hour, and "median" rates ranging from $750 to $560 per hour. National Law Journal, "A Nationwide Sampling of Law Firm Billing Rates" (filed herewith as Exhibit L).[7]

### B. The Legal Work For Which CREW Seeks Compensation is Well-Documented and the Time is Reasonable.

While a fee applicant "has the burden of establishing the reasonableness of its fee request," that burden is met when supporting documentation is "of sufficient detail and probative value to enable the court to determine with a high degree of certainty that such hours were actually and reasonably expended," *Role Models America, Inc. v. Brownlee*, 353 F.3d 962, 970 (D.C. Cir. 2004) (citations and internal quotation marks omitted); *see also American Petroleum Inst. v. EPA*, 72 F.3d 907, 915 (D.C. Cir. 1996) ("petitioner must submit 'sufficiently detailed information about the hours logged and the work done'") (citation omitted). As this Court recognizes, "the ultimate inquiry is whether the total time claimed is reasonable" and a claimant is thus required to provide "sufficient detail . . . so that [the court] can evaluate what the lawyers were doing and the reasonableness of the number of hours spent on those tasks." *Smith*, 466 F. Supp. 2d at 158.

---

[6] Both Mr. Sobel and Ms. Weismann have been practicing law for over 30 years. Sobel Decl. ¶ 2; Weismann Decl. ¶ 2.

[7] In *Salazar I*, the Court considered several such surveys, including one conducted by the *National Law Journal* in 1998, and concluded that their results were "generally consistent with and corroborative of the rates" calculated by Dr. Kavanaugh and adopted by the Court. 123 F. Supp.2d at 14.

Here, CREW is submitting in support of its request declarations detailing the number of hours counsel devoted to discrete tasks performed at specific stages of the litigation, based upon counsel's contemporaneous time notations. *See, e.g.,* Sobel Decl. ¶ 6 (describing work as "Research re Coconut Road matter and relevant congressional action;" "Research re 'categorical' exemptions and privacy;" etc.). Such detail distinguishes CREW's documentation from the kind of "generic entries" the D.C. Circuit has admonished fee applicants to avoid. *Role Models*, 353 F.3d at 971 (finding inadequate "numerous entries in which attorneys billed simply for 'research' and 'writing'"). Given the relatively small number of hours for which CREW seeks compensation, the amount of detail provided is clearly adequate to enable the Court to "evaluate what the lawyers were doing and the reasonableness of the number of hours spent on those tasks." *Smith*, 466 F. Supp. 2d at 158.

Mr. Sobel has been an active member of the bar and has practiced law since May 1980. Sobel Decl. ¶ 2. Ms. Weismann has been an active member of the bar and has practiced law since November 1979. Weismann Decl. ¶ 2. Both have extensive experience litigating FOIA cases in the federal courts and have been recognized as leading experts in the field. Sobel Decl. ¶ 3; Weismann Decl. ¶ 3. As attorneys with over 30 years of experience, Mr. Sobel and Ms. Weismann are entitled to compensation at an hourly rate of $709 for work performed from June 2010 through May 2011, and $734 for work performed from June 2011 through May 2012. *See* Kavanaugh Decl. ¶ 24.

Applying those rates to the hours detailed in the declarations of counsel, CREW is entitled to an award of attorneys' fees based upon a lodestar amount of $56,199 as follows:

| Attorney | Hours | Rate | Lodestar |
|---|---|---|---|
| David L. Sobel | 6.3 | 709 | $4,466 |
|  | 61.2 | 734 | $44,920 |
| Anne L. Weismann | 0.5 | 709 | $354 |
|  | 8.8 | 734 | $6,459 |
| **Total Lodestar - Merits** |  |  | **$56,199** |

In addition, CREW seeks compensation for time devoted to the preparation of this motion, *see* Sobel Decl., ¶ 7; Weismann Decl. (attached breakdown of hours), in the amount of $18,966,[8] as follows:

| Attorney | Hours | Rate | Lodestar |
|---|---|---|---|
| David L. Sobel | 23.1 | 771 | **$17,810** |
| Anne L. Weismann | 1.5 | 771 | **$1,156** |
| **Total Lodestar - Fees** |  |  | **$18,966** |

As detailed above, CREW seeks a total award of attorneys' fees in the amount of $75,165 for time reasonably expended by counsel in litigating the merits of this case and in the preparation of this motion.[9] In addition, CREW seeks reimbursement of costs reasonably incurred in the amount of $1,150, for the filing fee CREW paid to the Court upon the initiation of this action; cost of serving process; and the fee paid to CREW's expert economist. Sobel Decl., ¶ 8.

---

[8] The adjusted *Laffey* matrix establishes the current market rate for attorneys with more than 20 years' experience at $771 per hour. Kavanaugh Decl., Attachment 3.

[9] CREW intends to supplement its request for attorney's fees to account for additional time spent in the preparation of its reply in support of this motion.

**Conclusion**

For the foregoing reasons, the Court should grant this motion and order defendant DOJ to pay CREW attorneys' fees in the amount of $75,165 and costs in the amount of $1,150.

Respectfully submitted,

 */s/ David L. Sobel*
DAVID L. SOBEL, D.C. Bar No. 360418
1818 N Street, N.W.
Suite 410
Washington, DC 20036
(202) 246-6180

ANNE L. WEISMANN, D.C. Bar No. 298190
MELANIE SLOAN, D.C. Bar No. 434584
Citizens for Responsibility and
   Ethics in Washington
1400 Eye Street, N.W., Suite 450
Washington, D.C. 20005
(202) 408-5565

 Counsel for Plaintiff